*105 Spina, J.
In this case, the plaintiff, the school committee of Lexington (school committee), appealed a decision by a Superior Court judge confirming an arbitrator’s award reinstating a teacher, Mark Zagaeski, after the school district superintendent had terminated his employment for conduct unbecoming a teacher. We granted the plaintiff’s application for direct appellate review. This case presents an issue left unresolved by this court in School Dist. of Beverly v. Geller, 435 Mass. 223 (2001) (Geller). We must determine the scope of authority granted to an arbitrator by G. L. c. 71, § 42 (teacher dismissal statute), to reinstate a teacher who was dismissed for conduct that the arbitrator found constituted, at least nominally, a valid basis for dismissal.[1]
We conclude that in light of the stated purposes of the Massachusetts Education Reform Act of 1993 (Reform Act or Act), of which the teacher dismissal statute is a part, the arbitrator exceeded the scope of his authority by awarding reinstatement of Zagaeski on the basis of the “best interests of the pupils” in the district, despite having found that the school district carried its burden to show facts amounting to conduct unbecoming a teacher. See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27; G. L. c. 71, § 42. We reverse the decision of the Superior Court judge and vacate the arbitration award.[2]
1. Background, a. Facts.[3] Zagaeski’s dismissal from his position at the Lexington public schools arose from a series of incidents that took place prior to the spring of 2011.[4] By that time, *106 Zagaeski had been employed by the Lexington school district (school district) since 2000 as a physics teacher.[5] Until 2011, Zagaeski’s teaching evaluations had been uniformly positive, and he had never been disciplined by the district. He was commended by classroom observers for creating a classroom environment in which students felt comfortable asking questions and were engaged in the learning process.
At Lexington High School, Zagaeski taught an integrated math and physics class for students who tended to be at-risk academically and had struggled in math and science classes in the past. Many of these students also faced behavioral issues and some had been diagnosed with attention deficit disorder and other learning challenges. In order to engage this student population, Zagaeski developed a teaching style that was less hierarchical. He encouraged collaboration and a more relaxed classroom atmosphere. The arbitrator found that, as a result, “the students had a more familiar relationship with Dr. Zagaeski than they would have with a teacher following a more traditional teaching style” and that “[Zagaeski] was more flexible with boundaries than another teacher might have been.” However, Zagaeski’s nontraditional boundaries eventually caused problems.
In April, 2011, a seventeen year old female student in Zagaeski’s class was disappointed with the grade she was then receiving and asked Zagaeski, in front of her classmates, whether there was any way she could “pay ... for a better grade.” A male student in the class asked, “You mean short of sexual favors?” Rather than correcting the male student for making a comment encouraging the trade of sex for grades, Zagaeski chose to engage in the dialogue himself. “Yes, that is the only thing that would be accepted,” he stated. Students in the classroom laughed, and Zagaeski continued by saying, “Don’t be ridiculous” and told the female student that the only way to raise her grade would be better work. He then encouraged her to come after school for extra help if she had questions.
Two days later, the female student did go to Zagaeski’s classroom after school for extra help. Zagaeski was in his classroom *107 assisting a second female student in setting up equipment for laboratory work that she would be doing that afternoon. The first female student again asked Zagaeski, “[C]an’t I just pay you for a better grade?” Zagaeski responded, “Well, no ... you know that the only thing that I would accept is a sexual favor.” The second female student exclaimed, “Dr. Z!” and laughed. However, the first female student made a complaint to her guidance counsellor about Zagaeski’s comments, which the arbitrator determined was a result of the student feeling troubled by the comments.
Following the student’s complaint, the school principal commenced an investigation, which was then taken up by the central administration. Zagaeski was provided with written notice that an investigation had commenced into allegations of sexual harassment against him, and he was placed on administrative leave. The assistant superintendent then interviewed a number of staff members and students. He also arranged for an investigative interview of Zagaeski, which was attended by the assistant superintendent, counsel for the school district, union counsel for Zagaeski, and the president of the teacher’s union.
Following the interview, Zagaeski came to understand that the allegations against him were quite serious. He then wrote a letter to the assistant superintendent expressing remorse and an intent to improve his classroom approach. In the letter he admitted to “the weakness of an appropriate boundary between myself and my students” and the “need to create much clearer guidelines, not only for the students in my classroom, but for my own behavior towards students as well.” He also stated, “Allowing ... sexually inappropriate comments in the class to go unchallenged, and even to take part in that banter myself is completely out of line ...”
Subsequently, the district superintendent reviewed Zagaeski’s letter and his personnel file and was briefed by the assistant superintendent regarding the investigative interview and other interviews that the assistant superintendent had conducted with students and staff. The superintendent thereafter provided Zagaeski with formal notice of the district’s intent to dismiss him from employment and of his right to meet with the superintendent to provide additional information on his own behalf. Zagaeski requested such a meeting, which he attended with counsel. Also present at the meeting were the superintendent and assistant superintendent, counsel for the school district, a representative from the Massachusetts Teachers Association and the president of the teacher’s union.
*108 Soon thereafter, the superintendent informed Zagaeski in writing that he was dismissed from his position. The dismissal was based on six separate instances of conduct found to constitute conduct unbecoming a teacher. The dismissal letter also stated that any one of the instances alone would have been sufficient to justify his dismissal.
b. Arbitration award. Pursuant to his rights under the teacher dismissal statute, Zagaeski timely filed an appeal from the school district’s dismissal decision, which, as mandated by the statute, resulted in arbitration proceedings. See G. L. c. 71, § 42, fourth par. Based on undisputed evidence and Zagaeski’s testimony at the arbitration hearing, the arbitrator concluded that the school district had carried its burden to establish only one of its six bases for dismissal of Zagaeski, specifically Zagaeski’s admission that, “in response to a female student’s inquiry as to whether she ‘could just pay ... for a higher grade’ [he] responded, ‘No. The only thing I would accept is a sexual favor.’ ”
Regarding this conduct, the arbitrator found that although it was intended only as a joke, it rose to the level of sexual harassment as defined in the school committee’s “Policy Prohibiting Harassment.”[6] The arbitrator further found that even though the comments by Zagaeski were not intended to be taken in earnest, objectively they were inappropriate comments for a teacher to malee to a student. Furthermore, the comments had the subjective effect of offending the student or making her sufficiently uncomfortable to lodge a complaint with her guidance counsellor. Therefore, the arbitrator found that these comments created a hostile or offensive educational environment for the female student.
Nevertheless, the arbitrator went on to find that this instance of sexual harassment was “relatively less egregious” and that the two comments regarding the trade of sex for grades, separated by *109 two days, could be viewed as “one isolated instance” of sexual harassment. Thus, the arbitrator concluded that Zagaeski’s conduct constituted a “relatively minor and isolated” violation of the harassment policy, which only “nominally” constituted conduct a teacher. The arbitrator further found that in light of Zagaeski’s strong performance throughout his employment, it would be in the best interests of the pupils in the district that he be retained as a teacher. Therefore, the arbitrator issued an award reinstating Zagaeski with full back pay, less two days of unpaid suspension, which was the most severe discipline for which the school district would have had “just cause,” according to the arbitrator.
c. Superior Court decision. Following the issuance of the arbitration award, the school committee filed a complaint and application to vacate the arbitration award in the Superior Court on the bases that the arbitrator had exceeded his statutory authority in modifying the punishment imposed by the school district and that the arbitrator’s award violated public policy. Zagaeski filed a counterclaim and application to confirm the award.
Under the teacher dismissal statute, judicial review of an arbitration award is limited to the grounds set forth in G. L. c. 150C, § 11. See G. L. c. 71, § 42, sixth par. One such ground is if the arbitrator “exceeded [his or her] powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law.” G. L. c. 150C, § 11 (a) (3). The Superior Court judge, referencing existing uncertainty in the case law surrounding the precise scope of an arbitrator’s authority under the teacher dismissal statute to reduce or alter the disciplinary penalty imposed by a school district, concluded that the arbitrator had not exceeded his authority in issuing the award. The judge stated that although he was inclined to follow the reasoning of Justice Cordy’s plurality opinion in Getter in support of a conclusion that the arbitrator had exceeded the scope of his authority, the judge was given pause by a footnote in the opinion, which states in relevant part, “This is not the case of an arbitrator finding a teacher to have engaged in minor misconduct that, however, nominally fit within a category on which dismissal could be based. In such circumstances, an arbitrator’s finding that the conduct did not rise to the level of misconduct contemplated by the statute as a ground for dismissal is one that would likely lie within the scope of his authority.” Geller, 435 Mass. at 231 n.7 (Cordy, J., concurring). Therefore, because the arbitrator’s award *110 in this case tracked precisely the footnote in Geller in concluding that Zagaeski’s conduct only “nominally” constituted conduct unbecoming a teacher, the judge concluded that the arbitrator’s award was not in excess of his statutory authority.[7]
Consequently, the judge denied the school committee’s motion to vacate the arbitration award and granted Zagaeski’s application to confirm. The school committee appealed from the decision of the Superior Court and filed an application for direct appellate review. We granted the school committee’s application, and we reverse.
2. Standard of review. As a general matter, “a reviewing court is strictly bound by an arbitrator’s factual findings and conclusions of law, even if they are in error.” School Comm. of Lowell v. Robishaw, 456 Mass. 653, 660 (2010), quoting School Comm. of Pittsfield v. United Educators of Pittsfield, 438 Mass. 753, 758-759 (2003) (Pittsfield). This strict standard of review is highly deferential to the decision of an arbitrator, and it reflects a strong public policy in the Commonwealth in favor of arbitration. Pittsfield, supra at 758. See Geller, 435 Mass. at 228 (Cordy, J., concurring); Bureau of Special Investigations v. Coalition of Pub. *111 Safety, 430 Mass. 601, 604 n.4 (2000), quoting Delta Air Lines, Inc. v. Air Line Pilots Ass’n, Int'l, 861 F.2d 665, 670 (11th Cir. 1988) (“An arbitrator’s result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet it may not be subject to court interference”). Such strong public policy arises in part from a general recognition that arbitration has long served as an effective means of resolving labor disputes without resort to the courts. Pittsfield, supra. Therefore, in order to protect the efficiency that arbitration affords in resolving these disputes, the Legislature often strictly limits the circumstances in which a court may vacate an arbitral award — lest arbitration become merely an intermediate step between a dispute and litigation in court. Id.
In the education context, the Reform Act replaced de novo review of teacher dismissal decisions by the Superior Court with mandatory arbitration in order to “depoliticize[ ] and streamline[ ]” the teacher dismissal process. See Geller, 435 Mass. at 225 n.l (Cordy, J., concurring); 1992 House Doc. No. 5750, at 2 (letter from Governor William Weld accompanying first draft of Reform Act). Compare G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6. The Reform Act provided for limited judicial review of arbitration awards by reference to G. L. c. 150C, § 11. See St. 1993, c. 71, § 44. However, a reviewing court must vacate an arbitration award under the circumstances set forth in G. L. c. 150C, § 11 (a), including if the arbitrator exceeded his or her authority in granting the award. G. L. c. 150C, § 11 (a) (3). School Comm. of Lowell v. Vong Oung, 72 Mass. App. Ct. 698, 704 (2008), quoting Board of Higher Educ. v. Massachusetts Teachers Ass’n, NEA, 62 Mass. App. Ct. 42, 47 (2004) (under teacher dismissal statute, “[t]he question whether an arbitrator exceeded his or her authority is always subject to judicial review”).
Ordinarily, where arbitration is mandated by the terms of a collective bargaining agreement, the scope and limits of the authority of the arbitrator are ascertained by reference to the terms of the agreement. School Comm. of Chicopee v. Chicopee Educ. Ass’n, 80 Mass. App. Ct. 357, 364 (2011) (Chicopee). Indeed, judicial deference to arbitrators’ awards stems in part from a recognition that the parties bargained for and agreed that an arbitrator would serve as a neutral third party in interpreting the written agreement between the parties, whether it be a com *112 mercial contract or a collective bargaining agreement. Geller, 435 Mass. at 229-230 (Cordy, J., concurring). In such circumstance, an arbitrator may be uniquely qualified to interpret the “law of the shop.” Id. However, in a case such as this, where arbitration is mandated by statute, the exclusive source of the arbitrator’s authority is the statute itself. G. L. c. 71, § 42. Chicopee, supra at 365 (observing that in Geller, both Justice Cordy’s concurrence and Justice Cowin’s dissent agreed with this proposition). See Geller, 435 Mass. at 230 n.5 (Cordy, J., concurring). Id. at 240 (Cowin, J., dissenting). Consequently, courts are as well, if not better, positioned to interpret the “law of the land” in the form of the statutes of the Commonwealth. Geller, supra 229-230 (Cordy, J., concurring), and cases cited. Therefore, judicial review of the arbitrator’s interpretation of the authorizing statute, particularly regarding the scope of the arbitrator’s authority under the statute, is “broader and less deferential” than in cases of judicial review of an arbitrator’s decision arising from the interpretation of a private agreement. Atwater v. Commissioner of Educ., 460 Mass. 844, 856-857 (2011), citing Geller, supra at 229 (Cordy, J., concurring).
We conclude that in light of the stated purposes of the Reform Act, of which the teacher dismissal statute is a part, combined with the specific language of the teacher dismissal statute itself, the arbitrator exceeded the scope of his authority by awarding reinstatement of Zagaeski. See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27; G. L. c. 71, § 42, fifth and sixth pars.
3. Statutory scheme. The statutory scheme governing teacher dismissals set forth in G. L. c. 71, § 42, was enacted as part of the Reform Act, which brought broad-based changes to the funding and governance structure of the public education system in Massachusetts. Geller, 435 Mass. at 225 n.l (Cordy, J., concurring). See generally St. 1993, c. 71. In enacting this statute, the Legislature declared it a “paramount goal” to provide a public education system of “sufficient quality” to afford all children the opportunity to participate in, and contribute to, the political, social, and economic life of the Commonwealth. G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27. The Legislature further identified four specific policy goals the Reform Act was intended to ensure: “(1) that each public school classroom provides the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their sense of security or self-esteem, (2) a consistent commitment of *113 resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational performance goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement.” Id.
In furtherance of these purposes, the Reform Act made several changes to the statutory scheme governing teacher dismissals, including shifting from school committees to principals and superintendents the responsibility for dismissing teachers, mandating that teachers’ appeals from dismissal decisions proceed directly to arbitration, and providing for limited review of an arbitrator’s award, rather than de novo review of the dismissal decision, in Superior Court. Compare G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6, with G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44.
According to the teacher dismissal statute as enacted in 1993, school officials may not dismiss a teacher with “professional teacher status”[8] except for “inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards ... or other just cause.” G. L. c. 71, § 42, third par. If a teacher elects to appeal a dismissal decision to an arbitrator, the burden is on the school district to prove that its dismissal decision was based on one of the grounds set forth in the statute. G. L. c. 71, § 42, fifth par.
The statute further provides the standard by which the arbitrator must review the school district’s decision. Specifically, the statute states: “In determining whether the district has proven grounds for dismissal consistent with this section, the arbitrator shall consider the best interests of the pupils in the district and the need for elevation of performance standards.” Id.
Finally, the statute sets forth the range of remedies an arbitrator may grant to a teacher upon a finding that the dismissal decision was “improper under the standards set forth in this section.”[9] G. L. c. 71, § 42, sixth par.
*114 4. Discussion. The school committee argues in part that the arbitrator exceeded the scope of authority set forth in the teacher dismissal statute by modifying the punishment imposed by the school district despite having found that the school district carried its burden to show conduct unbecoming a teacher. The school committee contends that the arbitrator here found that Zagaeski’s conduct constituted conduct unbecoming a teacher because it is the facts found and the manner in which they are described by the arbitrator, not the label ascribed to the conduct, that is dispositive. See Geller, 435 Mass. at 231 (Cordy, J., concurring). The arbitrator found Zagaeski’s conduct to be “obviously . . . inappropriate,” in violation of the school district’s sexual harassment policy, subjectively offensive, and of the sort to create a “hostile educational environment.” Thus, the arbitrator described the conduct in a manner establishing that Zagaeski’s comments constituted conduct unbecoming a teacher even though the arbitrator concluded that the conduct only “nominally” rose to that level.[10] Id. at 231 (Cordy, J., concurring).
The school committee further argues in favor of the interpretation of the statute set forth in Justice Cordy’s concurrence in Geller. See 435 Mass. at 231, 234 (Cordy, J., concurring). Specifically, the school committee argues that once an arbitrator con- *115 eludes that the school has proved one of the grounds upon which the statute permits dismissal, the arbitrator is not authorized then to impose a lesser punishment than that selected by the school. See id. According to the school committee, footnote 7 in Justice Cordy’s concurrence could then be understood to mean that only in a circumstance where the conduct at issue is so minor that it does not, in substance, constitute conduct unbecoming a teacher or another enumerated ground permitting dismissal does the arbitrator have the authority to alter the punishment imposed by the school. See id. at 231 n.7 (Cordy, J., concurring). The school committee contends that here, the conduct found by the arbitrator was sufficiently egregious to constitute in substance, not merely in name, conduct unbecoming a teacher. Therefore the arbitrator’s decision does not fall into the narrow exception for “nominal” conduct contemplated in Justice Cordy’s concurrence in Geller. See id.
Zagaeski argues, however, that the language of the teacher dismissal statute in fact permits an arbitrator to adjust the discipline imposed upon a teacher even after finding that the conduct rises to the level of one of the grounds for which dismissal is permitted by the statute. Specifically, Zagaeski contends that the language of G. L. c. 71, § 42, sixth par., contemplates the adjustment of a disciplinary penalty by the arbitrator in that it states, “Upon a finding that the dismissal was improper under the standards set forth in this section, an arbitrator may award back pay, benefits, reinstatement, and any other appropriate non-financial relief or any combination thereof’ (emphasis added). G. L. c. 71, § 42, sixth par. Zagaeski argues that the finding that dismissal is “improper” may arise from the arbitrator’s conclusion that the school district failed to carry its burden to show conduct permitting dismissal, or it may arise from the arbitrator’s independent conclusion that dismissal was excessive in light of the nature of the misconduct found to have occurred. Further, Zagaeski argues that the arbitrator cannot have exceeded his authority by considering Zagaeski’s past performance as a teacher in determining that his dismissal would not be in the best interest of the students in the district because the dismissal statute mandates that the arbitrator engage in such an inquiry. G. L. c. 71, § 42, fifth par.
a. Scope of arbitrator’s authority to alter discipline imposed by school district. The teacher dismissal statute does not grant the arbitrator the discretion to adjust the discipline selected by the school district to the extent Zagaeski maintains. The purpose of *116 the Reform Act was not to enhance the employment rights of public school teachers. See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27. Rather, the stated purposes of the Reform Act express a concern for the increased accountability of educators and the improvement of the quality of education provided in public schools. Id. Further, the Act eliminated the teacher tenure system, and its reforms to the teacher dismissal statute were intended to “depoliticize and streamline” the teacher dismissal process. St. 1993, c. 71, § 44. 1992 House Doc. No. 5750, at 2 (letter from Governor William Weld accompanying first draft of Reform Act).
To be sure, the Act preserved certain employment protections for public school teachers who achieve professional teacher status, and it replaced the phrase “good cause” with “just cause” in the catchall provision of the teacher dismissal statute. Compare G. L. c. 71, § 42, as amended by St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6. See Geller, 435 Mass. at 233 n.9 (Cordy, J., concurring) (describing use of phrase “just cause” as ensuring that dismissals under catchall provision were limited to serious misconduct). However, these changes were intended to serve as a means of furthering the Act’s central goal of enhancing the quality of the Commonwealth’s public schools, not as an end in themselves. See Atwater, 460 Mass. at 846, 854. The Act affords some measure of employment protection for teachers to enable schools to attract and retain excellent educators while still ensuring that principals and superintendents can act swiftly in mating critical staffing decisions in the schools for which they are responsible. See id.; Davis v. School Comm. of Somerville, 307 Mass. 354, 362 (1940) (“Manifestly one of the most important duties involved in the management of a school system is the choosing and keeping of proper and competent teachers”). The Legislature’s decision to shift dismissal decisions to principals and superintendents and away from school committees, combined with the Governor’s stated goal of “depoliticizing” the teacher dismissal process, indicates that the statute was intended to ensure that teachers were dismissed only for valid reasons. However, the Legislature did not necessarily intend for arbitrators to have broad discretion to adjust disciplinary decisions based on misconduct that the school had carried its burden to establish.
Our decisions prior to the Reform Act help to shed light on the balance the Act was intended to achieve between empowering *117 school officials to manage the teaching staff effectively while providing some measure of protection to professional status teachers. Specifically, cases prior to the Reform Act expressed concern over teacher dismissal decisions by school committees that were based on “personal hostility, ill will or political animosity” such that the school’s stated grounds for dismissal were nothing more than pretext. MacKenzie v. School Comm. of Ipswich, 342 Mass. 612, 619 (1961). See Kelley v. School Comm. of Watertown, 330 Mass. 150, 151 (1953) (reorganization of school administration was “subterfuge” and undertaken in bad faith to enable school committee to demote and replace petitioner); Sweeney v. School Comm. of Revere, 249 Mass. 525, 529-530 (1924) (school committee voted to eliminate position of principal not on good faith need to conserve resources but due to disagreement with principal’s political views).
Similar concerns animate footnote 7 in Justice Cordy’s concurring opinion in Geller, 435 Mass. at 231 n.7. Justice Cordy concluded that the teacher dismissal statute does not permit an arbitrator to override a school district’s decision to dismiss a teacher if the arbitrator finds that the school has proved conduct amounting to one of the grounds permitting dismissal. Id. at 231. However, Justice Cordy acknowledged that at the same time, the statute would permit an arbitrator to override a school district’s dismissal decision if the misconduct in issue is so minor that it does not, in substance, constitute the sort of misconduct for which the statute permits dismissal. Id. at 231 n.7.
Consequently, if an arbitrator finds that the school district has labeled a teacher’s conduct “conduct unbecoming a teacher” when the conduct does not, in substance, truly rise to that level, or that the school district has used that label merely as a pretext to dismiss the teacher based on personal, political, or other unauthorized bases, the arbitrator is empowered to vacate the punishment imposed by the school district. Thus, the statutory directive requiring arbitrators to consider the best interests of the pupils and the need to elevate performance standards in reviewing whether the school district carried its burden to show conduct permitting dismissal is intended in part to prevent politically motivated dismissal decisions. Indeed, the standards governing the arbitrator’s review are likely intended to serve as a direct reminder to the arbitrator of the purposes underlying the Reform Act and the proper considerations for a school district to undertake in its dismissal decisions. See Geller, 435 Mass. at 235.
*118 In this case, however, there is no indication in the record before us that the grounds on which Zagaeski was dismissed were mere pretext or that his misconduct was so minor that it did not in substance constitute one of the enumerated bases on which the statute permits dismissal. Therefore, Justice Cordy’s observation in footnote seven in Geller regarding “minor” misconduct, and the concerns expressed in early case law regarding political dismissals based on “subterfuge,” are not implicated here.
Public school teachers hold a position of special public trust. Perryman v. School Comm. of Boston, 17 Mass. App. Ct. 346, 349 (1983) (“There are certain forms of employment which carry a position of trust so peculiar to the office and so beyond that imposed by all public service that conduct consistent with this special trust is an obligation of the employment”). Dupree v. School Comm. of Boston, 15 Mass. App. Ct. 535, 538 (1983). They are responsible for more than teaching basic academic skills. See Geller, 435 Mass. at 238-239 (Ireland, J., concurring in the result) (“a teacher’s responsibilities include the maintenance of a safe environment that is conducive to ... students’ growth”). As we recently acknowledged, “[s]tudents must be able to trust that they will be safe in the presence of their teachers and coaches. They must be able to rely on their teachers and coaches to exercise sound judgment and maintain appropriate boundaries, even when they themselves may be unable to do so.” Atwater, 460 Mass. at 852 (quoting underlying arbitration award). The creation of a hostile learning environment through sexual harassment, whether verbal or physical, can be detrimental to the well-being of students who experience such harassment in part because it may unreasonably interfere with their education. See G. L. c. 151C, § 1 (e). Moreover, citizens of this Commonwealth, including public school students, have a constitutional right to be free from gender-based discrimination, which includes certain forms of sexual harassment. Art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution. O’Connell v. Chasdi, 400 Mass. 686, 693 (1987) (concluding that sexual harassment can violate rights secured under art. 1). Numerous statutory enactments also make clear the importance of protecting children from sexual harassment in school. See G. L. c. 151C, § 2 (g) (sexual harassment of student in any program or course of study in educational institution is unfair educational practice); G. L. c. 214, § 1C (granting right to be free from sexual harassment as defined in *119 G. L. cc. 151B and 151C); 603 Code Mass. Regs. § 26.07(2) (requiring public schools to strive to prevent sexual harassment and to respond promptly to reports of its occurrence). Zagaeski’s conduct undermined these policies, as well as one of the central purposes of the Reform Act: to ensure an educational setting that safeguards, rather than warps, a child’s self-esteem. See G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27.
Of additional concern, teachers are in part responsible for instilling core constitutional values in students in preparation for their participation as citizens in a democracy. See Dupree, 15 Mass. App. Ct. at 539. A teacher who models sexually harassing behavior in front of public school students as if it is all in good fun undercuts our constitutional value of freedom from gender discrimination. See O’Connell, 400 Mass. at 693. Indeed, students who witness a teacher engage in such conduct may come to believe that such conduct is acceptable in an academic or professional setting. See Dupree, supra at 538, quoting Faxon v. School Comm. of Boston, 331 Mass. 531, 534 (1954) (“As role models for our children [teachers] have an ‘extensive and peculiar opportunity to impress [their] attitude and views’ upon their pupils”). Inculcation of those sorts of values by teachers is not acceptable in our public schools.
The Reform Act specifically vested in principals the power to dismiss teachers, subject to review and approval by superintendents, in order to raise the accountability of school officials for the success of their schools. See St. 1993, c. 71, § 44. See also Pittsfield, 438 Mass. at 760; Higher Educ. Coordinating Council/ Roxbury Community College v. Massachusetts Teachers’ Ass’n/ Mass. Community College Council, 423 Mass. 23, 29 n.6 (1996); 1992 House Doc. No. 5750, at 2. We have long-recognized decisions regarding teacher employment as central to effective school management. See Higher Educ. Coord. Council, supra at 28-29; School Comm. of W. Springfield v. Korbut, 373 Mass. 788, 794-795 (1977); Davis, 307 Mass. at 362. Although undoubtedly a difficult decision, the superintendent undertook a thorough investigation, determined that Zagaeski engaged in conduct unbecoming a teacher, and dismissed him on that ground. This determination was within the superintendent’s statutory authority and was not unwarranted in light of the broader implications of Zagaeski’s conduct and the purposes underlying the Reform Act. See G. L. c. 69, § 1; G. L. c. 71, § 42.
b. Best interests of the pupils in the district and the need to elevate performance standards. We further acknowledge that the *120 teacher dismissal statute does authorize the arbitrator to engage in a substantive review of dismissal decisions insofar as it requires arbitrators to consider the “best interests of the pupils in the district and the need for elevation of performance standards.” See G. L. c. 71, § 42, fifth par. To conclude otherwise would render the statutory mandate that the arbitrator undertake these considerations effectively meaningless. See Geller, 435 Mass. at 242-243 (Cowin, J., dissenting). However, we disagree that this statutory language authorizes an arbitrator to draw on a teacher’s past performance to override a dismissal decision based on a teacher’s conduct having threatened the safety and welfare of his or her students. If a teacher’s past performance could be used as a basis on which an arbitrator could award reinstatement — because, as here, the arbitrator concluded it was in the students’ best interests to have high performing teachers —■ then the “need for elevation of performance standards” and the “best interests of the pupils” would come to mean the same thing. However, the statute should not be construed to render one of the two standards governing the arbitrator’s review as redundant of the other. School Comm. of Brockton v. Teachers’ Retirement Bd., 393 Mass. 256, 262 (1984), quoting 2A C. Sands, Sutherland Statutory Construction § 46.06 (4th ed. 1973) (“[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous”).
The distinct meanings of these two standards can be ascertained by reference to the other provisions of the teacher dismissal statute and the stated purposes of the Reform Act. See Saccone v. State Ethics Comm’n, 395 Mass. 326, 334-335 (1985) (statutes should be construed to constitute “harmonious whole”; otherwise their purpose may be defeated [citation omitted]). When the Legislature enacted the Reform Act, it identified the importance of safeguarding students’ “sense of security or self-esteem” in the classroom as distinct from, though equally as important as, the establishment and achievement of specific educational performance goals. G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27. This distinction between safety and well-being on one side and academic achievement on the other is also mirrored in the enumerated grounds on which a school district may dismiss a professional status teacher. In one category, a school district may dismiss a teacher for performance-based reasons including “inefficiency,” “incompetency,” or failure to satisfy performance standards. G. L. c. 71, § 42, third par. In the *121 other category, a school district may dismiss a teacher for conduct that jeopardizes the well-being of students or the proper functioning of the school community, including “conduct unbecoming a teacher,” “insubordination,” or “incapacity.” Id. Therefore, the standards by which the arbitrator must review a dismissal decision should be construed in light of this same distinction.
Where the teacher conduct in issue is performance-based, the arbitrator should consider the school district’s decision primarily in light of the need to raise performance standards. However, when the conduct in issue has jeopardized the safety or self-esteem of students in the classroom setting, the arbitrator should consider the best interests of the pupils primarily in light of the pupils’ interest in a safe learning environment. Here, the arbitrator permitted the pupils’ interest in the academic success of their school to override their interest in a safe, supportive classroom environment. This determination was in excess of the arbitrator’s authority because it had the effect of nullifying one of the stated purposes of the Reform Act. The Legislature cannot have intended a teacher’s past academic performance to be used to justify reinstatement of a teacher found to have engaged in conduct that created a hostile learning environment for certain students. See Commonwealth v. Parent, 465 Mass. 395, 409 (2013) (statutes may not be interpreted so as to yield absurd results). Despite Zagaeski’s apparent success as a classroom teacher, that “track record” should not be used to conclude that it is in the “best interests” of students to reinstate a teacher who was found to have violated the school’s sexual harassment policy.[11] By awarding *122 reinstatement of Zagaeski based on an interpretation of the “best interests of the pupils” to mean the same thing as “the need to elevate performance standards,” the arbitrator’s award overrode the superintendent’s decision on an unauthorized basis and runs contrary to the core purposes of the Reform Act and the high standards of conduct the public expects from its teachers.
5. Conclusion. For the foregoing reasons, the order of the Superior Court confirming the arbitrator’s award is vacated, and the case is remanded to the Superior Court for entry of an order vacating the arbitration award.

So ordered.

 General Laws c. 71, § 42 (teacher dismissal statute), provides in part that a teacher who has served in a school district for at least three consecutive school years may not be dismissed except for “inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards developed pursuant to [G. L. c. 71, § 38,] or other just cause.”

We acknowledge the amicus brief submitted by the Massachusetts Teachers Association in support of Zagaeski and the amicus brief filed by the Massachusetts Association of School Committees, Inc., and the Massachusetts Association of School Superintendents in support of the Lexington School Committee.

A reviewing court is bound by the facts found by the arbitrator. School Comm. of Lowell v. Robishaw, 456 Mass. 653, 660-661 (2010). Accordingly, we summarize the facts leading up to Zagaeski’s dismissal based on the facts found in the arbitrator’s award.

Zagaeski’s dismissal was based on six separate instances of conduct that the school district found to constitute conduct unbecoming a teacher. Because the arbitrator concluded that the school district had carried its burden to establish that only one of these incidents constituted, at least nominally, conduct unbecoming a teacher, we address only that incident.

Zagaeski earned his doctorate in cellular biophysics in 1981. Following postdoctoral work, he was employed as a teacher for six years at a private school. He began working at Lexington High School in 2000. He took a leave of absence from the fall of 2002 to the fall of 2004 to work in private industry. He returned to Lexington High School in the fall of 2004 and worked there continuously until his termination in June, 2011.

As reflected in the arbitrator’s decision, the policy provides, in part: “Harassment is defined as any communication or conduct that is sufficiently serious to limit or deny the ability of a student to participate in or benefit from the educational program .... It includes . . . any communication . . . such as jokes . . . that offends or shows disrespect to others based upon . . . color [or] gender ....’’ It further provides: “While all types of harassment are prohibited, sexual harassment requires particular attention .... In addition to the above examples, other sexually oriented conduct, whether it is intended or not, that is unwelcome and has the effect of creating ... [an] educational environment that is hostile, offensive, intimidating or humiliating . . . may constitute sexual harassment. . . .”

The judge further concluded that the arbitration award did not constitute a violation of public policy. We have recognized that an arbitrator may exceed the scope of his or her authority in awarding reinstatement of an employee where the award violates public policy. See Atwater v. Commissioner of Educ., 460 Mass. 844, 848 (2011). The requirements for establishing that such an award is contrary to public policy are three-fold: (1) the conduct in issue violates a well-defined and dominant public policy set forth in statutory or judicial sources, (2) the conduct in issue is integral to the employee’s duties, and (3) the award itself violates public policy because the employee’s conduct is of the sort that requires dismissal. School Comm. of Lowell v. Robishaw, 456 Mass. 653, 664 (2010). Bureau of Special Investigations v. Coalition of Pub. Safety, 430 Mass. 601, 604-605 (2000). Because we conclude that the arbitrator exceeded the scope of his authority on other grounds, we need not reach this argument. However, we do acknowledge that there is a well-defined and dominant public policy prohibiting teacher-on-student sexual harassment and that Zagaeski’s conduct, undertaken in the classroom setting, was integral to the performance of his employment duties. See G. L. c. 151C, § 2 (g) (sexual harassment of student is unfair educational practice); G. L. c. 214, § 1C (granting right to be free from sexual harassment in school); 603 Code Mass. Regs. § 26.07(2) (2012) (requiring public schools to strive to prevent sexual harassment and to respond promptly to reports of its occurrence). See also School Dist. of Beverly v. Geller, 435 Mass. 223, 238 (2001) (Geller) (Ireland, J., concurring in the result), quoting Massachusetts Highway Dep’t v. American Fed’n of State, County, & Mun. Employees, Council 93, 420 Mass. 13, 17 (1995) (teacher’s repeated infliction of physical abuse on students in school was misconduct that “goes ‘to the heart of a worker’s responsibilities’ ”); Massachusetts Highway Dep’t, supra.

Under § 41 of G. L. c. 71, a teacher who has served in the public schools of a school district for the three previous consecutive years is afforded “professional teacher status,” and is entitled to the procedural and substantive employment protections set forth in G. L. c. 71, § 42. Zagaeski was a teacher with professional teacher status at the time of his dismissal.

We reject Zagaeski’s argument that the remedial language contained in paragraph six of the teacher dismissal statute is the source of the arbitrator’s *114 authority. The provision states in part, “Upon a finding that the dismissal was improper under the standards set forth in this section, the arbitrator may award [equitable remedies].” Plainly, this is a reference back to the standards by which a school district may dismiss a teacher and according to which an arbitrator must review a decision. G. L. c. 71, § 42, pars. 3, 5, 6. This provision does not authorize the arbitrator to alter any disciplinary penalty he or she finds to be “improper” according to the dictionary definition of “improper" and without reference to the substantive standards set forth in paragraphs three and five of the statute. Furthermore, the range of equitable remedies available enables an arbitrator to make a teacher whole if the school district is found to have failed to carry its burden to show a valid basis for dismissal. The range of remedies does not imply complete discretion of the arbitrator to impose a different punishment that he or she prefers.

Prior to the Reform Act, comments alone, without other physical conduct, were recognized as sufficient to constitute “conduct unbecoming a teacher.” See MacKenzie v. School Comm. of Ipswich, 342 Mass. 612, 616 (1961). Although the Reform Act made significant changes to the teacher dismissal statute, it preserved “conduct unbecoming a teacher” as a permitted ground for dismissal of a teacher. Compare G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, with G. L. c. 71, § 42, as amended through St. 1988, c. 153, §§ 4-6. Where the Legislature reenacts statutory language following a judicial interpretation of it, the Legislature is presumed to accept that interpretation. Boston Hous. Auth. v. Bell, 428 Mass. 108, 110 (1998), and cases cited.

Although a teacher’s length of service and past performance may be considered as factors mitigating against dismissal under the rubric of “just cause” in collective bargaining agreements, and the Reform Act replaced the phrase “good cause” with “just cause” as an enumerated basis on which a teacher may be dismissed, the teacher dismissal statute does not permit an arbitrator to engraft an additional just cause analysis onto each of the grounds enumerated in the statute on which dismissal may be based. See St. 1993, c. 71, § 44. See also Geller, 435 Mass. 223, 231, 233 (Cordy, J., concurring). A plain reading of the teacher dismissal statute makes clear that a school district may dismiss a teacher for any of the enumerated bases “or other just cause” (emphasis added). G. L. c. 71, § 42. Therefore, the statute implies that dismissal based on any of the enumerated grounds would be just cause, and “other just cause” stands alone as an additional ground upon which dismissal may be based. The phrase “other just cause” does not permit a reduction in the penalty imposed for conduct constituting one of the other enumerated grounds. See Geller, supra at 232-233 (Cordy, J., concurring). This interpretation of the statute comports with a long history of judicial interpretation of similarly worded provisions in *122 collective bargaining agreements. Id. at 232 (Cordy, J., concurring), and cases cited. Consequently, the fact that the Reform Act replaced “other good cause” with “other just cause” as a basis for dismissal, without further change to the text of the provision, is not sufficient to indicate a legislative intent to import an additional just cause analysis into the other grounds permitting dismissal.